IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| LESTER A. TODD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 09-3259-CV-S-ODS |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his applications for disability benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in October 1959, has a tenth grade education, and has prior work experience as a stores laborer, parking aide, folding machine operator, coin machine collector, and a surveillance system monitor. His last job was as a surveillance system monitor for a Dillards: he left that job in October 2002 so he could move to West Plains, Missouri, and care for his parents. He looked for work in West Plains but could not find a job. Nonetheless, his application – filed in January 2006 – alleges he became disabled in October 2002 due primarily to back and leg pain.

Plaintiff testified he was in a car accident when he was twelve years old and suffered serious injuries to his left leg that resulted in that leg being shorter than his right. While he used lifts and other devices to compensate, the disparity affected the stress and pressures on his back. At any rate, the first medical record relating to Plaintiff's back is from June 2003, at which time he was diagnosed as suffering from muscle spasms and was prescribed Flexeril. R. at 208-09. The next record relating to

Plaintiff's back is from January 5, 2006 – the day before he applied for benefits. Plaintiff complained of pain and numbness in his left leg over the course of a week. Plaintiff was unable to lie on the examination table and exhibited tenderness in the lumbar region. His doctor arranged for an MRI and x-ray. R. at 206-07. Before these tests could be performed Plaintiff saw Dr. Michael Ball for a consultative examination in connecting with his application for state medical assistance. Dr. Ball also noted the need for a CT scan, MRI, or other diagnostic evaluations. He opined that Plaintiff was unable to work but also indicated that with "correction" Plaintiff might be able to perform sedentary work. R. at 211-12.

A CT scan was performed on January 23, 2006. It revealed degenerative disk changes with mild spondylosis at T12-L1, a mild bulge at L2-3, and a disk protrusion and spondylosis at L5-S1. The protrusion appeared "to affect the left S1 nerve root and potentially the thecal sac." R. at 213.

On February 20, 2006, Plaintiff reported pain in his low back that continued to his hip and leg. Plaintiff reported that Vicodin was not helping and he was prescribed methadone. R. at 270. During a consultative exam on March 16 Plaintiff stated that the medication was helping relieve the pain, R. at 217; however, on March 21 Plaintiff reported he was getting little relief from methadone, whereupon his dosage was increased. R. at 267.

On April 4, Plaintiff asked his doctor to take him off methadone, re-prescribe Vicodin, and complete a disability evaluation form. His doctor (Dr.Jeffrey Dryden) changed the medication as requested and suggested Plaintiff go to a pain clinic. There is no indication as to whether Dr. Dryden completed the disability questionnaire. R. at 266. On May 3, Plaintiff admitted the methadone was helping more than he realized and asked to be put back on it; Dr. Drydon complied. R. at 265.

Plaintiff visited St. John's Spine Center in July 2006 and reported that the methadone had helped considerably. Upon examination he demonstrated normal gait, normal movement in his lumbar spine, no tenderness, and no pain in his hips, but straight leg raising was positive. Based on a CT scan it was recommended that heate undergo a discectomy or nerve root injection. R. at 238-39. On September 5 Plaintiff

told Dr. Dryden that he got "reasonable relief from methadone" and wanted to try injections before undergoing surgery. R. at 263. Dr. saw r. Dryden referred Plaintiff to the in Management Clinic where he saw Dr. Munish Loomba. Dr. Loomba recommended injections, but Plaintiff indicated he wanted to think about it some more. R. at 241-42. On November 6 he returned to Dr. Dryden for a refill of methadone; Dr. Dryden encouraged Plaintiff to make a choice between injections and surgery. R. at 262.

The next important medical record is from August 2007. Dr. Dryden expressed concern that Plaintiff was "doctor shopping" and told him that he would no longer prescribe methadone. Plaintiff said he had decided to have surgery and had an appointment with a neurosurgeon the following week. R. at 283. There is no record documenting Plaintiff had such an appointment. On October 17 Plaintiff saw Dr. Loomba for a follow-up after receiving injections. Dr. Loomba noted Plaintiff experienced mild and short term relief, exhibited tenderness, and that straight leg raising was negative. R. at 288-90. On October 30 Plaintiff told Dr. Dryden that the injections provided no relief and Dr. Dryden increased the methadone. R. at 281. In December, Dr. Dryden added Oxycodone. R. at 280. In January, Dr. Dryden increased the dosage of both methadone and Oxycodone. R. at 279. Plaintiff was told that if the injections did not provide relief the next step was surgery. R. at 286. Plaintiff indicated he had an appointment with a neurosurgeon. R. at 278. In June, Plaintiff decided not to have surgery "due to what other people have told him" and asked Dr. Dryden to increase his medication. R. at 305.

Plaintiff testified that he thought he could stand for twenty to thirty minutes before needing to sit and sit for forty-five to sixty minutes before needing to stand. R. at 50-51. He does yard work (including operating a riding lawn mower), vacuums, and does the laundry, but it takes him longer than it should because he needs to rest. R. at 52-53; 60. He told the ALJ that he could not do his job at Dillards because he could not assist others in apprehending shoplifters or perform similar security-related functions. R. at 47. However, when asked whether he could perform a similar job, Plaintiff testified as

3

follows: "I would like to think that I could but actually, I moved here six years ago and believe me, I tried to find a job down here doing that and there just isn't any." R. at 43.

The ALJ found Plaintiff could lift twenty pounds occasionally and ten pounds frequently, stand and walk thirty minutes at a time and four hours per day, and sit for six hours a day but needed the ability to stretch hourly. Based on testimony from a vocational expert, the ALJ concluded Plaintiff could return to his past work as a surveillance system operator as it is usually performed in the national economy because the job did not ordinarily call for the person to become involved in the actual apprehension of individuals. Accordingly, Plaintiff's applications for benefits were denied.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is suppoahrted by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

### A.

Plaintiff contends he met or equaled the condition described in a listed impairment; namely, listing 1.04A. This listing requires the claimant have a herniated disk impinging on a nerve root and

4

> Evidence of nerve root compression characterized by neuro-anatomic
> distribution of pain, limitation of motion of the spine, motor loss (atrophy
> with associated muscle weakness or muscle weakness) accompanied by
> sensory or reflex loss and, if there is involvement of the lower back,
> positive straight-leg raising test (sitting and supine).

The Record demonstrates Plaintiff has a herniated disk impinging on a nerve root. The Record does not demonstrate the ALJ was wrong to conclude Plaintiff did not meet any of the remaining requirements. Plaintiff's argument to the contrary, there is no evidence of limitations of motion of the spine or of motor loss accompanied by sensory or reflex loss. He contends he has established "neuro-anatomic distribution of pain" with medical records indicating he suffers from radiculopathy. These terms do not mean the same thing. Radiculopathy refers to a disorder of the spinal nerve root – which means the term may be applicable in this case solely because Plaintiff has a herniated disk impinging on a nerve root. The listing requires more, however; namely, distribution of pain throughout the nervous system. Moreover, even if radiculopathy is equated with neuro-anatomic distribution of pain, the evidence does not demonstrate the ALJ's decision is unsupported by substantial evidence. As will be discussed later, the ALJ's determination of Plaintiff's pain levels is supported by the Record.

## B.

While Plaintiff's remaining arguments are separated, they all relate to a single issue: the ALJ's determination of Plaintiff's residual functional capacity. Plaintiff contends the ALJ failed to properly consider the effects of obesity and carpal tunnel syndrome, failed to properly consider the effects of Plaintiff's spinal condition, and failed to properly assess Plaintiff's credibility.

Plaintiff did not testify as to any limitations caused by carpal tunnel syndrome. His symptoms lasted for no more than seven months in 2006. Under these circumstances – particularly the absence of any limitations on Plaintiff's functional capacity – the ALJ did not err in declining to treat this condition as severe. Similarly, Plaintiff does not identify

any limitation related to his obesity that he believes should be considered in ascertaining his residual functional capacity. While Plaintiff may be "obese," this fact has a role in the analysis only if his obesity imposes limitations in addition to those imposed by his pain. There being no evidence that this is the case, the ALJ did not err.

The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that she experiences. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
>   1. The claimant's daily activities;
>   2. the duration, frequency and intensity of the pain
>   3. precipitating and aggravating factors;
>   4. dosage, effectiveness and side effects of medication;
>   5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.  While current regulations incorporate these considerations, the Eighth Circuit has declared that the "preferred practice" is to cite <u>Polaski</u>.  <u>Schultz v. Astrue</u>, 479 F.3d 979, 983 (8th Cir. 2007).

While there is evidence supporting Plaintiff's claim, there is also substantial evidence supporting the ALJ's decision.  Plaintiff quit his job because he moved, and at least initially did not work because he could not find a job.  Therefore, the ALJ was more than justified in concluding Plaintiff did not become disabled on the alleged onset date.  Of course, Plaintiff could have become disabled at a later time, but thereafter he continued looking for work.  Contrary to Plaintiff's argument, this is not a "failed work attempt" that should not be held against him.  It was not a "work attempt" because Plaintiff did not work.  However, the facts – that he thought he could work, looked for work, and was unable to work only because he could not find a job – constitute probative evidence of Plaintiff's subjective beliefs about his abilities.  In addition, Plaintiff's activities (housework, yard work, caring for his parents) were deemed inconsistent with his claims of disabling pain.  Plaintiff attempts to "explain away" these activities, but the weight of evidence is to be decided by the ALJ.  Plaintiff initially told the ALJ he thought he could return to his job as a surveillance system monitor if he did not have to chase suspects; again, he attempts to characterize his testimony in a manner that is not damaging, but the ALJ's factual findings are entitled to deference because "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide."  <u>Baldwin v. Barnhart</u>, 349 F.3d 549, 558 (8th Cir. 2003).

Plaintiff has been prescribed rather strong narcotic medication.  Impairments that can be controlled are not disabling, <u>Medhaug v. Astrue</u>, 578 F.3d 805, 813 (8th Cir. 2009), so it becomes necessary to determine the extent to which his pain was alleviated.  Unfortunately, Plaintiff provided conflicting statements regarding the medication's efficacy, which provides the ALJ with justification for (1) discounting his testimony and (2) believing the medication provided significant relief.  When advised to have injections, Plaintiff delayed for a rather significant period of time.  When advised to have surgery, Plaintiff declined.  Meanwhile, Plaintiff's treating physician became concerned that Plaintiff was engaged in drug-seeking behavior.  The failure to follow a physician's

7

advice is inconsistent with complaints of disabling pain because it is proper to presume that a person experiencing the degree of pain described by Plaintiff would seek ameliorative measures.  E.g., Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006).  Finally, while it cannot be the sole factor, the ALJ was entitled to consider the fact that Plaintiff's treating doctors never suggested that he was limited to the extent he described.

Plaintiff places great emphasis on Dr. Ball's report.  This report is of limited value for a variety of reasons.  First, it is a consultative opinion offered without the benefit of diagnostic testing.  While diagnostic testing ultimately confirmed the presence of a medical condition, it was impossible for Dr. Ball to offer a meaningful opinion about that condition because he did not know what it was.  Second, the ultimate opinion – that Plaintiff cannot work – is not a medical opinion so it is not one Dr. Ball cannot provide.  Finally, Dr. Ball indicated that Plaintiff might be able to work if corrective measures are feasible.  A corrective measure – surgery – is feasible, and as stated earlier Plaintiff has declined to pursue it.

Having determined Plaintiff's testimony was not completely credible, the ALJ's next task was to ascertain Plaintiff's residual functional capacity.  The record supports the ALJ's conclusion that Plaintiff could perform work requiring him to stand and walk for thirty minutes at a time and sit for six hours in a day so long as he could stand and stretch hourly.[1]  Based on the VE's testimony and Plaintiff's own statement, substantial evidence supports the ALJ's conclusion that Plaintiff can perform the job of a surveillance system monitor in the manner it is usually performed in the national economy.

### III.  CONCLUSION

The outcome might be different if the Court were the trier of fact.  This observation does not aid Plaintiff because the standard of review is deferential.  Substantial evidence

---

[1]These limits are very similar to the limits Plaintiff offered in his own testimony. R. at 50-51.

in the record as a whole supports the decision, so the Commissioner's final decision is affirmed.

IT IS SO ORDERED.

DATE: October 20, 2010

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT